UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN THE MATTER OF TARA CROSBY, L.L.C. AND CROSBY TUGS, L.L.C., AS THE OWNERS AND OWNERS PRO HAC VICE OF THE M/V CROSBY COMMANDER AND HER CARGO, ENGINES, TACKLE, GEAR APPURTENANCES, ETC., *IN REM*, PETITIONING FOR THE EXONERATION FROM | CIVIL ACTION<br><br>NO. 17-5391<br><br>SECTION M (4) |

## **ORDER & REASONS**

Before the Court are (1) a motion to disqualify counsel for Tara Crosby, LLC and Crosby Tugs, LLC (collectively, "Crosby") filed by claimants Robert Pitre and Joseph Hebert,[1] and (2) a motion to disqualify counsel for claimants filed by Tetra Technologies, Inc. ("Tetra").[2] Crosby opposes claimants' motion,[3] and claimants oppose Tetra's motion.[4] On November 4, 2019, the Court held an evidentiary hearing on both motions.[5] Having considered the parties' memoranda, the testimony and other evidence elicited at the hearing, the record, and the applicable law, the Court issues this Order & Reasons concluding that neither counsel should be disqualified.

**I.   BACKGROUND**

This cases arises out of the sinking on the morning of May 29, 2017, of the *M/V Crosby Commander* ("*Commander*"), owned and operated by Crosby, while towing the barge *Marmac 25* on a hawser in the Gulf of Mexico, offshore Louisiana, during severe weather.[6] Claimants

---
[1] R. Doc. 163.
[2] R. Doc. 167.
[3] R. Doc. 175.
[4] R. Doc. 173.
[5] R. Doc. 186.
[6] R. Docs. 1 at 1-3; 110 at 12; 167-3 at 3.

Pitre and Hebert were, respectively, the master and relief captain at the time the vessel sank.[7] At the time the vessel became imperiled, Hebert was at the wheel and Pitre was asleep in his bunk.[8] The captains and two deckhands evacuated as the vessel sank, though one deckhand drowned.[9]

When claimants arrived on shore, they were met by Monty Wade Savoy, Jr., Crosby's corporate safety director.[10] Savoy accompanied them to Houma, Louisiana, where they were seen by a doctor. Savoy explained to them that they would be interviewed by the U.S. Coast Guard and would meet with Crosby's lawyers.[11] Crosby had asked counsel, Miles P. Clements and Joseph E. Lee, III, to investigate the sinking of the *Commander*.[12] On May 30, 2017, claimants were interviewed by the Coast Guard.[13] Before the interview, claimants spoke to counsel for Crosby and gave them and Savoy permission to attend the Coast Guard interviews.[14] The Coast Guard required that claimants provide signed written witness statements regarding the sinking of the *Commander* and complete work/rest worksheet forms for the day of the sinking, in addition to sitting for the interview. Hebert wrote and signed his own statement, but Pitre asked Clements to transcribe his statement for him.[15] Clements transcribed Pitre's statement during the interview, read the written statement to Pitre, and provided the statement to Pitre for his review.[16] Pitre then reviewed and signed the statement.[17] Hebert also gave a recorded statement to Lee.[18]

---

[7] R. Doc. 167-3 at 3.
[8] *Id.*
[9] R. Doc. 163-2 at 5-9.
[10] R. Doc. 175-3 at 1.
[11] *Id.* at 1-2; Testimony of Savoy.
[12] *Id.* at 2; Testimony of Clements.
[13] *Id.* at 2.
[14] Testimony of Pitre, Hebert, Savoy & Clements.
[15] The other surviving crewman, Justo Velasquez, also asked Clements to transcribe his statement. Velasquez settled with Crosby without filing suit. R. Doc. 175-3 at 10 n.30.
[16] Testimony of Pitre & Clements.
[17] *Id.*
[18] R. Doc. 175-3 at 3.

Crosby initiated this lawsuit by filing a petition for exoneration or limitation of liability (the "Crosby petition") on May 31, 2017.[19] Claimants, both represented by the same counsel, filed their answer and claim to the Crosby petition on September 11, 2017, and a third-party complaint against Tetra on October 27, 2017.[20] On June 11, 2018, the Court ordered claimants' counsel to provide a letter regarding potential conflicts posed by their representation of claimants.[21] Claimants provided an opinion letter written by Professor Dane S. Ciolino for *in camera* inspection on July 17, 2018, after which the Court ordered that the letter should be filed under seal and not disclosed to other parties, and the Court took no further action.[22]

On September 25, 2019, the parties attended a settlement conference, during which possible conflicts of interest regarding Crosby's counsel, due to their interactions with claimants on May 30, 2017, were raised.[23] All conflict issues were discussed on October 9, 2019, at a scheduled pretrial conference, which the Court necessarily converted into a status conference when the parties indicated they would file cross-motions to disqualify.[24] The Court also continued the trial set for November 4, 2019, and instead scheduled an evidentiary hearing on said motions for that date.[25]

At the November 4, 2019 hearing, the Court first heard Tetra's motion. Claimants presented the testimony of Professor Ciolino. The Court then heard claimants' motion. Claimants presented the testimony of both claimants, claimants' Coast Guard witness statements, an email from Savoy, and an email from Clements attaching claimants' and the other surviving

---

[19] R. Doc. 1.
[20] R. Docs. 11; 25.
[21] R. Doc. 92.
[22] R. Doc. 102.
[23] R. Doc. 147.
[24] R. Doc. 161.
[25] *Id.*

crew member's witness statements and work/rest worksheet forms.[26] Crosby presented the testimony of Wade Savoy and Miles Clements, and both claimants' witness statements and work/rest worksheet forms.[27]

## II. PENDING MOTIONS

### A. Claimants' Motion

Claimants move to disqualify Crosby's counsel based on the events that occurred on May 30, 2017, the day of the Coast Guard interview. First, claimants allege that they formed an attorney-client relationship with Crosby's counsel when, according to them: (1) Crosby's counsel told them that they were their lawyers and to relay that information to the Coast Guard in order to gain permission to attend the interviews; (2) Clements wrote the witness statement for Pitre, who "struggles with reading and reading comprehension"; and (3) Hebert gave counsel information in the "recorded statement that would otherwise have been shielded by attorney-client privilege."[28] Claimants allege that "they [reasonably] believed these lawyers were [at the interviews] to represent *their* interests as *their* lawyers."[29] Accordingly, Crosby's counsel, they argue, should be disqualified under Louisiana Rules of Professional Conduct 1.7 or 1.9, and 1.10, because the Crosby's and claimants' interests were and are adverse, the matter is the same, and the conflict is imputed to Crosby's counsel's law firm.[30] Second, claimants argue that even if the Court finds they did not form an attorney-client relationship with Crosby's counsel, said counsel should still be disqualified under Louisiana Rule of Professional Conduct 4.3.[31] Claimants allege that Crosby's counsel misled them, as unrepresented parties, by not clarifying their role as

---

[26] R. Doc. 187.
[27] *Id.*
[28] R. Doc. 163-6 at 7.
[29] *Id.* (emphasis in original).
[30] *Id.* at 6-7.
[31] *Id.* at 10.

counsel only for Crosby and "induc[ing] [them] to create substantive evidence adverse to their own interests."[32] Third, claimants argue that even if the Court does not disqualify counsel under the preceding rules, they should be disqualified under Louisiana Rule of Professional Conduct 3.7.[33] They assert that Clements and Lee may need to be called as necessary witnesses during trial because of their roles in the creation of the May 30, 2017 recorded and written statements.[34] Finally, claimants maintain that this conflict has not been waived. They argue that claimants' counsel only realized that Pitre "struggles with reading" at the September 25, 2019 settlement conference,[35] and that Crosby would not be prejudiced because the trial has been continued without date while claimants would be greatly prejudiced by a finding of waiver.[36]

Crosby responds that claimants' motion is a meritless litigation tactic.[37] First, Crosby argues that neither Clements nor Lee ever created an attorney-client relationship with claimants: claimants did not manifest an intent of hiring the attorneys for legal advice, the attorneys never offered or agreed to provide legal advice, nor did the claimants receive legal advice from them.[38] Crosby emphasizes that Clements and Lee disclosed that they were Crosby's attorneys, that their presence at the interviews was not a formal appearance on behalf of claimants, and that they did not receive confidential information from claimants.[39] Even if Crosby's counsel did form an attorney-client relationship with claimants, Crosby maintains that they should not be disqualified under Rule 1.7 because their interests were not adverse on the morning of May 30, 2017, and that soon after, it would have been clear that Clements and Lee were solely Crosby's counsel because

---

[32] *Id.*
[33] *Id.*
[34] *Id.* at 11.
[35] *Id.* at 10.
[36] *Id.* at 11-12.
[37] R. Doc. 175-3 at 1.
[38] *Id.* at 6-8.
[39] *Id.* at 7-8.

5

they extended claimants settlement offers on Crosby's behalf.[40] Crosby adds that neither should its counsel be disqualified under Rule 1.9 because the alleged representation (even if it existed for any length of time) was very brief and no confidential information was disclosed.[41] As there is no Rule 1.7 or 1.9 conflict, Crosby maintains, there is no Rule 1.10 imputation.[42] Second, Crosby asserts that its counsel should not be disqualified under Rule 4.3 because they never stated or implied to claimants that they were disinterested, they never gave claimants legal advice, and they did not mislead claimants, but rather "insisted that Claimants answer all questions truthfully" during the interview process.[43] Third, Crosby argues that its counsel should not be disqualified under Rule 3.7 because they are not likely to be necessary witnesses at trial.[44] It maintains that any information sought from Clements or Lee can be obtained from another source: the testimony of claimants themselves, the written and recorded oral statements, or Savoy's testimony.[45] Finally, Crosby argues that claimants have waived any issues regarding disqualification due to the long delay since claimants and their counsel knew of the alleged conflict, the tactical reason for bringing this motion (namely, that claimants want to exclude the written and recorded statements), and the extreme prejudice Crosby would suffer if its counsel were disqualified.[46]

### B. Tetra's Motion

Tetra moves to disqualify claimants' counsel based on their representation of both Pitre and Hebert.[47] Tetra argues that Pitre and Hebert are directly adverse to each other and have

---

[40] *Id.* at 9-10.
[41] *Id.* at 10-11.
[42] *Id.*
[43] *Id.* at 11.
[44] *Id.* at 12.
[45] *Id.*
[46] *Id.* at 13-19.
[47] R. Doc. 167-3 at 1.

6

asserted claims against each other. It notes that in their sixth defense to the Crosby petition, claimants argue that the events which led to their injuries were the result of the negligence of Crosby "and/or those whom [Crosby is] responsible" and in their tenth defense to the Crosby petition, claimants argue that the *Commander* was "operated in a willful, wanton and reckless manner."[48] Tetra alleges that claimants, both employees of Crosby at the time of the sinking, significantly contributed to the cause of the sinking through Hebert's "negligent navigation" of the *Commander* and Pitre's decision to insert a "dog" into the towing winch, despite the incoming severe weather, "in direct contravention of the policy of Crosby."[49] Tetra argues that because Crosby is vicariously liable for the captains' alleged negligence, claimants have accordingly asserted claims against each other.[50] Furthermore, under the applicable comparative negligence regime, in order to maximize their respective recoveries, claimants will need to establish the negligence of the other, making their interests directly adverse and the conflict nonwaivable.[51] Tetra likens representation of claimants to that of the simultaneous representation of a driver and passenger in relation to an automobile accident, a situation the Louisiana State Bar Association has opined attorneys should avoid entirely.[52]

Claimants respond by referring to an opinion letter, filed under seal and not distributed, written by Professor Ciolino.[53] Claimants explain that there is no conflict in their dual representation because neither has an interest in alleging any fault against the other, and regardless, they have provided informed consent, waiving any such conflict.[54]

---

[48] *Id.* at 2-3.
[49] *Id.*
[50] *Id.* at 2-4.
[51] *Id.* at 4-5.
[52] *Id.* at 6-7.
[53] R. Doc. 173-2 at 2-3.
[54] *Id.*

7

## III. LAW & ANALYSIS

### A. Legal Standard

As succinctly explained by another section of this Court:

> The Fifth Circuit has made clear that "[m]otions to disqualify are substantive motions affecting the rights of the parties and are determined by applying standards developed under federal law." *In re American Airlines, Inc.*, 972 F.2d 605, 610 (5th Cir.1992) (citing *In re Dresser Indus.*, 972 F.2d 540, 543 (5th Cir. 1992)); *see also Green v. Administrators of the Tulane Educational Fund*, 1998 WL 24424 (E.D. La. 1998). Although federal courts may adopt state or ABA rules as their ethical standards, whether and how these rules apply are questions of federal law. *See American Airlines*, 972 F.2d at 610. The ethical canons that are relevant to this Court's opinion include (1) the local rules for the Eastern District of Louisiana, (2) the ABA's Model Rules of Professional Conduct, (3) the ABA's Model Code of Professional Responsibility, and (4) the Louisiana State rules of conduct. *See Horaist v. Doctor's Hospital of Opelousas*, 255 F.3d 261, 266 (5th Cir. 2001); *FDIC v. United States Fire Ins. Co.*, 50 F.3d 1304, 1311-12 (5th Cir. 1995).

*Zichichi v. Jefferson Ambulatory Surgery Center, LLC*, 2008 WL 2859232, at *1 (E.D. La. July 22, 2008). This Court has adopted the Rules of Professional Conduct of the Louisiana State Bar Association as its rules of conduct. *See* LR 83.2.3. These rules are substantially the same as the ABA Model Rules. *Lange v. Orleans Levee Dist.*, 1997 WL 668216, at *2 (E.D. La. Oct. 23, 1997). The following Louisiana Rules of Professional Conduct are relevant to the pending motions:

**Rule 1.7. Conflict of Interest: Current Clients**

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

    (1) the representation of one client will be directly adverse to another client; or

    (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing.

**Rule 1.9. Conflict of Interest: Former Client**

(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

(b) A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client

(1) whose interests are materially adverse to that person; and

(2) about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter; unless the former client gives informed consent, confirmed in writing.

(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

(1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or

(2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.

**Rule 1.10. Imputation of Conflicts of Interest: General Rule**

(a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7 or 1.9, unless the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm.

…

(c) A disqualification prescribed by this rule may be waived by the affected client under the conditions stated in Rule 1.7.

….

**Rule 3.7. Lawyer as Witness**

(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a

>    necessary witness unless:
>
>    (1)  the testimony relates to an uncontested issue;
>
>    (2)  the testimony relates to the nature and value of legal services rendered in the case; or
>
>    (3)  disqualification of the lawyer would work substantial hardship on the client.
>
> (b) A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 or Rule 1.9.
>
> **Rule 4.3. Dealing with Unrepresented Person**
>
>    In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested. When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in a matter, the lawyer shall make reasonable efforts to correct the misunderstanding. The lawyer shall not give legal advice to an unrepresented person, other than the advice to secure counsel, if the lawyer knows or reasonably should know that the interests of such a person are or have a reasonable possibility of being in conflict with the interests of the client.

The ethical rules are a "useful guide for adjudicating motions to disqualify," but they are not dispositive; courts must consider the public interest and litigants' rights at stake, especially the right of a party to counsel of its choice. *Lange*, 1997 WL 668216, at *3 (quoting *FDIC v. U.S. Fire Ins.*, 50 F.3d at 1314); *see also Zichichi*, 2008 WL 2859232, at *2. While an opposing party may bring conflict of interest matters to the attention of the court, "[s]uch an objection should be viewed with caution, however, for it can be misused as a technique of harassment." *FDIC v. U.S. Fire Ins.*, 50 F.3d at 1315 (quoting MODEL RULES OF PROF'L RESPONSIBILITY r. 1.7 cmt. (AM. BAR ASS'N 1992)).

Finally, a court must also determine whether a party has waived its objection to a conflict of interest when a motion has not been timely filed. *In re Modanlo*, 342 B.R. 230, 236 (D. Md. 2006). In addition to considering the length of the delay, which is not alone dispositive, courts may examine: "[w]hen the movant learned of the conflict; whether the movant was represented by counsel during the delay; why the delay occurred, and in particular, whether the motion was

delayed for tactical reasons; and whether the disqualification would result in prejudice to the nonmoving party." *Id.* at 236-37 (quoting *Buckley v. Airshield Corp.*, 908 F. Supp. 299, 307 (D. Md. 2004) (quoting *Employers Ins. of Wausau v. Albert D. Seeno Constr. Co.*, 692 F. Supp 1150, 1165 (N.D. Cal. 1988))).

## B. Analysis

### 1. Claimants' Motion

#### a. Rules 1.7, 1.9, and 1.10

To determine whether Crosby's attorneys are in violation of Rules 1.7, 1.9, and 1.10, the Court must first consider whether they formed an attorney-client relationship with claimants on May 30, 2017. According to the *Restatement (Third) of the Law Governing Lawyers*, applied by the Louisiana Supreme Court in determining whether an attorney-client relationship exists or existed, such a relationship is created when:

> (1) a person manifests to a lawyer the person's intent that the lawyer provide legal services for the person; and either
>> (a) the lawyer manifests to the person consent to do so; or
>>
>> (b) the lawyer fails to manifest lack of consent to do so, and the lawyer knows or reasonably should know that the person reasonably relies on the lawyer to provide the services; or
>
> (2) a tribunal with power to do so appoints the lawyer to provide the services.

RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 14 (2000); *Zichichi*, 2008 WL 2859232, at *3 (citing *In re Austin*, 943 So. 2d 341 (La. 2006)).

The Court finds that claimants did not form an attorney-client relationship with Clements or Lee on May 30, 2017. Neither Pitre nor Hebert manifested an intent that Clements or Lee provide legal services for him and neither Clements nor Lee manifested consent to do so. Nor did either lawyer have reason to know that the claimants were relying on them to provide legal services. Even if claimants subjectively believed that Crosby's lawyers were also their lawyers,

11

such a belief was unreasonable. *See Lighthouse MGA, L.L.C. v. First Premium Ins. Grp., Inc.*, 448 F. App'x 512, 516 (5th Cir. 2011) ("[E]ven if Lighthouse subjectively believed that First Premium's general counsel was also Lighthouse's attorney, such a belief would not be reasonable."). The Court has considered the conflicting testimony of claimants and Clements (along with Savoy), and on this score finds Clements's testimony to be the more credible.

Claimants admit that before meeting these attorneys on May 30, 2017, Savoy told them they would meet with ***Crosby's*** lawyers. Clements and Lee introduced themselves to claimants as Crosby's counsel. Clements acknowledges that he offered to "assist" claimants, but he specifically told them he could not represent them against Crosby.[55] Claimants spoke to the attorneys before the Coast Guard interviews and gave the attorneys explicit permission to attend the interviews (as the Coast Guard required),[56] but such attendance does not rise to the level of representation. Claimants did the same for Savoy, who also attended the interview. As Crosby points out, these were Coast Guard interviews, not hearings.[57] They were not judicial or semi-judicial proceedings; the attorneys did not, and were not required to, make a formal appearance on behalf of claimants. Counsel did not participate in the give-and-take of the interviews in any way. They attended the interviews as part of their investigation of the sinking, an investigation which ***Crosby*** requested.

Before the interviews, Pitre asked Clements to transcribe his statement for him. At the time, Clements did not know that this request was made because of Pitre's difficulties with reading and writing. While the Coast Guard was asking questions and Pitre was responding,

---

[55] Testimony of Clements.
[56] Claimants insist that they were required to tell the Coast Guard that Clements and Lee were their attorneys in order for the Coast Guard to allow them to sit in on the interview. The Court does not credit this testimony over that of Clements, who testified that the Coast Guard merely required the attorneys to have claimants' permission to attend. This is especially so since non-lawyer Savoy was also allowed to sit in on the interview, and he was indisputably there as a non-lawyer representative of Crosby.
[57] R. Doc. 175-3 at 7-8.

12

Clements wrote down Pitre's words to prepare the written statement the Coast Guard was requiring. Clements then read the statement to Pitre and gave it to Pitre for his review, thereby affording Pitre the opportunity to correct anything that was inaccurate or to add anything he thought was omitted. Thereafter, Pitre signed the statement as his own. Such actions do not rise to the level of legal services, especially because there is no reason to believe that Pitre would not have comprehended what he was signing.[58] Furthermore, claimants and Crosby's counsel did not execute an agreement for legal services, nor did claimants pay the attorneys for any services.

Finally, if it was not already clear that the attorneys represented only Crosby before or during the interviews, after the interviews, the attorneys offered claimants a settlement amount ***on behalf of Crosby***. It would have been unreasonable for claimants to have believed that "their" lawyers were offering to pay their medical care expenses and a lump-sum amount in exchange for a release on behalf of their employer.

Claimants have not shown that any of the information Crosby's counsel received on May 30, 2017, was confidential, so that it could have been protected by attorney-client privilege. The information given in both the written and recorded statements was that claimants offered during the Coast Guard interviews, where Coast Guard officers and Savoy were also present. The written statements were shared with Savoy via email as well.[59]

Because no attorney-client relationship was ever formed, there is no basis to disqualify counsel under Rules 1.7, 1.9, or 1.10, which each require the foundational element of such a relationship.

---

[58] First, that a person struggles with reading does not mean that they cannot understand a statement read aloud to them. Second, without assistance, Pitre was able to read aloud, albeit with some difficulty, part of his statement when the Court asked him to do so during his testimony.

[59] *See* Exhibit 3.

13

### b. Rule 4.3

Even if an attorney does not form an attorney-client relationship with a party, he or she may still be found to have committed misconduct if the attorney dealt unfairly with the unrepresented person. *See In re Guilbeau*, 35 So. 3d 207, 211-12 (La. 2010). Attorneys have an obligation to clarify their professional relationship (*i.e.*, who they are representing) to an unrepresented person, and if they should reasonably have anticipated a misunderstanding, make an effort to correct it. *Id.* In these circumstances, attorneys may not give legal advice, other than advice to secure counsel, if they know or reasonably should know that there is a possibility of a conflict with that person's interests and that of their client. But "[n]ot every communication between a lawyer and an unrepresented person constitutes 'advice.'" *Zichichi*, 2008 WL 2859232, at *5 (citing *First Nat'l Bank of St. Bernard v. Assavedo*, 764 So. 2d 162 (La. App. 2000)).

Here, at the outset of their interactions with claimants on May 30, 2017, Clements and Lee did not communicate that they were "disinterested." Claimants were aware that the attorneys represented Crosby. There is no indication that at any point the attorneys stated or implied that they were not Crosby's counsel. Even if they should have reasonably anticipated a misunderstanding after asking for claimants' permission to attend the interviews or recording and transcribing claimants' Coast Guard statements, which the Court doubts, the attorneys corrected any possible misunderstanding when, on Crosby's behalf, they relayed to claimants the settlement offers Crosby made after the interviews. On June 30, 2017, only a month after the interviews, Clements sent claimants renewed offers in writing, clearly stating that he was relaying the offers again on behalf of Crosby.[60] *But cf. Guilbeau*, 35 So. 3d at 212 (attorney

---

[60] *See* R. Doc. 175-3 at 32-33.

transmitted an assignment document to the unrepresented person through his client without any explanation, and did not make any effort to clarify the professional relationship or correct the misunderstanding).

While, under the last sentence of Rule 4.3, Clements and Lee reasonably should have known that a possibility of conflict of interests might arise between Crosby and claimants, their interactions with claimants on May 30, 2017, cannot be said to involve giving legal advice. The attorneys interviewed claimants before they spoke to the Coast Guard, but there is no indication that they offered them legal counsel.[61] The attorneys sat quietly during the Coast Guard interviews; they did not speak on claimants' behalf or direct claimants on how to respond to the Coast Guard's questions. Clements's transcribing of Pitre's statement likewise does not amount to legal advice or services. That he may have selected which of Pitre's oral responses to include only shows he was acting like any note-taker, who must determine the most relevant portions of a lecture or speech to write down. Even if at any point on May 30, 2017, the attorneys did provide their view of claimants' legal obligations, because the attorneys explained that they represented Crosby, and did not state or imply that they represented claimants, they did not violate Rule 4.3. *Zichichi*, 2008 WL 2859232, at *5 (citing ANN. MODEL RULES OF PROF'L CONDUCT r. 4.3 cmt. 2 (AM. BAR ASS'N 2007) ("So long as the lawyer has explained that the lawyer represents an adverse party and is not representing the person, the lawyer may … explain the lawyer's own view of … the underlying legal obligations.")).

Consequently, Rule 4.3 provides no basis to disqualify Crosby's counsel.

---

[61] There was some conflict in the testimony of claimants and Clements on this point, with Pitre asserting that Clements told him to couch the principal cause of the sinking as weather as opposed to problems with the vessel or its equipment, and Clements denying he said any such thing. The Court finds Clements's testimony to be the more credible.

### c. Rule 3.7

To determine whether disqualification based on a violation of Rule 3.7 is merited, the Court must first determine whether a lawyer is likely to be a necessary witness at trial. "A lawyer is not 'likely to be a necessary witness' when evidence pertaining to each matter to which he could testify is available from another source." *Gibbens v. Quality Rental Tools, Inc.*, 2015 WL 1125168, at *2 (E.D. La. Mar. 12, 2015) (quoting *United States v. Starnes*, 157 F. App'x 687, 693-94 (5th Cir. 2005) (quoting *Horaist v. Doctor's Hosp. of Opelousas*, 255 F.2d 261, 266 (5th Cir. 2001))).

Claimants argue that because Clements and Lee "participated in the creation of witness statements and recorded statements," evidence which claimants argue is "improper," the attorneys are "necessary fact witnesses regarding the creation and substance" of the statements.[62] Claimants assert that because defense counsel has alluded to their intention "to cross-examine and/or impeach Claimants with the contents of the … statements," if the statements are admitted, they will be "compelled to call Crosby's Counsel to stand to rebut and refute the nature and validity of the statements."[63] But the written and recorded statements[64] themselves are available for trial, and testimony regarding their creation is not only available from claimants themselves, but from Savoy, who was present during the Coast Guard interviews and several of the interactions between claimants and Clements and Lee. Accordingly, the attorneys' testimony is not necessary because it would be cumulative of the other witnesses' testimony, which constitutes evidence available from sources other than the attorneys.

Hence, Rule 3.7 does not provide any basis to disqualify Crosby's counsel.

---

[62] R. Doc. 153-6 at 11.
[63] *Id.*
[64] As to the recorded statement, the Court notes that Hebert acknowledged in his deposition that the tape recorder was running from start to finish during the recording of his statement. R. Doc. 175-3 at 31.

### d. Waiver

Even if any of claimants' objections to Clements and Lee's alleged conflicts of interest were meritorious, claimants have waived these objections. First, claimants waited over two years after filing their complaint on September 11, 2017, to file the pending motion on October 16, 2019. They did so in accordance with a briefing schedule set by the Court at the October 9, 2019 status conference, originally scheduled as a ***pretrial conference***, when they told the Court they finally would file this motion.[65] Trial had been set for November 4, 2019.[66] Of course, for these two-plus years, claimants had known about their own interactions with Crosby's counsel in May 2017, and could not have had any doubt that these same attorneys represented only Crosby during the two years of litigation following the filing of their complaint. Such a serious delay in bringing the motion to disqualify is likely sufficient in itself to constitute waiver. *See Trust Corp. of Montana v. Piper Aircraft Corp.*, 701 F.2d 85, 87-88 (9th Cir. 1983) (finding that movants had waived their objection to a conflict of interest when they waited over two years, and only 33 days before the scheduled trial date, to file a motion to disqualify).

Second, claimants' counsel, who is their original counsel, have known about the interactions between Crosby's counsel and claimants since January 30, 2018, at the very latest, when both claimants were deposed.[67] Unlike the movants in *Jordan v. Philadelphia Housing Authority*, who filed a motion to disqualify shortly after a conflict was revealed in a deposition, claimants failed to act for over a year-and-a-half from the date of their depositions. *See* 337 F. Supp. 2d 666, 670-71 (E.D. Pa. 2004) (granting motion to disqualify). Claimants attempt to justify the delay in bringing this motion by asserting that their counsel did not realize until the

---

[65] R. Doc. 161.
[66] R. Doc. 123.
[67] *See id.* at 25-27, 29-31.

17

September 25, 2019 settlement conference that Pitre struggles with reading, and that they therefore did not understand the seriousness of the alleged conflict until then. But as Crosby points out, claimants' counsel have had access to reports prepared by claimants' and defendants' vocational rehabilitation experts, since April 5, 2018, and November 1, 2018, respectively.[68] The first report states that Pitre has "[l]imited formal education (8th grade with no GED)" and the second that he "scored at a second grade equivalency in reading and … can read simple words and phrases."[69] Regardless, claimants' arguments of alleged conflicts do not rely solely on Pitre's literacy level, and so this excuse does not justify the delay.[70]

Third, that claimants seek to exclude the written and recorded statements, as evidenced by their pending motion in limine,[71] at the very least raises questions about the tactical reasons for bringing this motion and delaying their filing of said motion until the eve of trial. *See Gibbens*, 2015 WL 1125168, at *3 (cautioning against use of motion to disqualify as a "technique of harassment").

Fourth, Crosby has incurred significant expenses defending this suit over the last two years and would incur a great deal more if it had to retain new counsel, who would have to learn and prepare a case which was almost ready for trial. Crosby would, therefore, be immensely prejudiced by a disqualification so late in the game.

In conclusion, not only does claimants' objection to the alleged conflicts of Crosby's counsel lack merit, claimants have also waived it.

---

[68] *Id.* at 34, 38.
[69] *Id.* at 35, 42.
[70] It is ironic that claimants seek to skewer Crosby's counsel for allegedly taking advantage of Pitre's limited reading ability at their very first meeting when it supposedly took over two years for their own counsel to recognize Pitre's limitation. Either Pitre's limitation is not so acute or Clements's perception is.
[71] R. Doc. 159.

### 2. Tetra's Motion

The Court finds Professor Ciolino's opinion letter and testimony compelling. Claimants have not asserted any claims against each other. Presented with claimants' litigation strategy in the sealed opinion letter, the Court is further assured that claimants do not plan to assert claims against each other, nor, as Professor Ciolino explained in his testimony, have they any reason to do so under the Jones Act. Because of the unique nature of the Jones Act, claimants' situation is not like that of car driver and passenger. The Court is convinced that claimants' interests are not adverse, and thus, there is no conflict in their concurrent representation, and no violation of Rule 1.7. Regardless, claimants have provided informed consent, thus waiving any potential conflict. There is, therefore, no reason to disqualify claimants' counsel.

## IV. CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that claimants' motion to disqualify counsel for Crosby (R. Doc. 163) and Tetra's motion to disqualify counsel for claimants (R. Doc. 167) are both DENIED.

New Orleans, Louisiana, this 18th day of November, 2019.

_____
BARRY W. ASHE
UNITED STATES DISTRICT JUDGE